UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MATTHEW J CAPANIS,

               Petitioner,

     v.

KENT CLARK,

               Respondent.

Case No.  19-cv-04562-SI

**ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

Matthew J. Capanis filed this *pro se* action for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his conviction in Contra Costa County Superior Court for a gang-related murder. The court issued an order to show cause why the writ should not be granted, respondent filed an answer, and Capanis filed a traverse.  For the reasons discussed below, the amended petition for writ of habeas corpus will be DENIED.

**BACKGROUND**

The California Court of Appeal described the evidence presented at trial.

*The Shooting*

On the evening of August 5, 2012, Nestor Navarro was doing laundry and hanging out with a man nicknamed "Nuts," 16-year old Ulises Grijalva, and a third man at the St. John's Apartments in Richmond. Capanis, his girlfriend Maria, and Jacob Stephens arrived at the complex and went into Maria's apartment. Shortly afterward, Capanis and Stephens returned and approached Navarro and his group. Capanis got "right in [Grijalva's] face" and asked "Do you know who I am?" Grijalva replied "Yes, I know who you are," and Capanis then said "Well, somebody broke into my house, and it fits your description." Grijalva said he did not know what Capanis was talking about, and attempted to shake Capanis' hand. Capanis asked Grijalva "who he hangs around with," and Grijalva replied "us," meaning the group he was with. Capanis then drew a gun and fired four or five shots at Grijalva. Stephens also drew a gun with a laser sight and began shooting. Navarro ran away from the scene. In total, he heard 10 or 11 gunshots.

Around 9:30 p.m. that night, Richmond Police Officer Alexander Caine was near the St. John's Apartments when he heard gunfire. He saw an individual, later identified as Stephens, exit one of the pedestrian gates of the complex clutching a metal object in his right hand that appeared to be a firearm. Stephens ran through a front yard and partially behind a shrub, and when he reemerged he was no longer holding the firearm. Stephens ignored Officer Caine's orders to stop and Caine pursued him on foot, eventually tackling him and placing him under arrest. The police retrieved a silver revolver equipped with a laser sight from the spot where Caine had briefly lost sight of Stephens.

Grijalva's autopsy revealed a total of six bullet wounds, one of which was a re-entry wound. The cause of death was multiple gunshot wounds. Seven bullets were recovered, four from Grijalva's body and three from the scene. Forensic analysis indicated that two of those bullets, one from the body and one from the scene, were fired from the gun discarded by Stephens. The other five bullets, three from the body and two from the scene, were fired by a second gun.

*The Kidnapping*

In the early afternoon the day before the shooting, Jose Flores was at the front door of his apartment at the St. John's Apartments when he was approached by three men, one of whom was Capanis. One of the men pointed a gun at Flores. The men told Flores "You're gonna leave with us," and fired a shot. Flores then got into a car with the men and they began driving. Flores was in the back seat with the gunman, whom he later identified as Capanis. Capanis repeatedly asked Flores "where was all his stuff at," and hit Flores "a couple of times." Flores said he did not know what Capanis was talking about. After about ten or fifteen minutes, the men drove Flores to a dead end and told him to get out of the car. Flores asked to use the telephone at a nearby house and called Navarro, who came to pick him up. Flores did not report the kidnapping at the time, but eventually spoke with detectives and identified Capanis as the gunman from a photo lineup.

*Gang Evidence*

As will be discussed in further detail below, evidence of certain of Capanis' past convictions was admitted as relevant to the various gang allegations. In particular, the prosecution introduced evidence that Capanis committed an armed robbery in March 2007 with David Riley, for which both men went to prison in 2007. Riley testified as a witness for the prosecution, although he was unwilling to do so.

On January 18, 2009, California Department of Corrections and Rehabilitation (CDCR) Officer Karl Grether was in a guard tower over the administrative segregation unit at Susanville Correction Center. Grether saw Capanis and another inmate assigned to a new inmate named Vela as a "security blanket," meaning that they would accompany the new inmate until they determined whether or not he was in good standing with the Norteño gang. Two other individuals approached the four men spoke to Vela and then took him to a corner of the yard. Capanis and another inmate then began punching Vela in the head and face. The assailants ignored Officer Grether's orders to get down. Officer Grether fired two plastic rounds that hit Capanis, but he continued to assault Vela. While Grether was reloading his weapon, someone on the yard yelled out a command and the assault ended. According to a nurse's report regarding the incident, Vela suffered a laceration to the right side of his face.

CDCR Gang Investigator Sergeant Casey Walsh testified that a "kite" was an inmate manufactured written note using "micro writing" and containing information such as

gang rules, enemy lists, membership lists, and history. Sergeant Walsh met Capanis in 2007 and conducted a gang investigation of him thereafter. Sergeant Walsh testified regarding a report describing an incident in which a kite was found in Capanis' anal cavity. The kite contained information regarding the Northern Structure prison gang.[2]

> [Footnote 2:]  Walsh testified that Northern Structure and Norteño had a "synonymous" meaning.

Sergeant Walsh also testified about the report of the January 2009 incident in which Capanis was seen assaulting Vela. Sergeant Walsh also observed a large "Huelga" bird tattoo on Capanis' lower back, and testified that the Huelga bird is a symbol of the Northern Structure prison gang. When asked a hypothetical question based in part on an individual involved in the security blanket incident with a Huelga bird tattoo, Walsh opined that such an individual would be a member of the Northern Structure gang.

Sergeant Michael Kindorf testified as a gang expert for the prosecution. To demonstrate the "pattern of criminal activity" required to meet the definition of a "criminal street gang," Kindorf testified that Alonzo Hernandez was a member of the Norteños, and in particular a member of the Varrio North Side (VNS) subset of the Norteños, from 2010 through 2012. The prosecution introduced certified documents showing that Hernandez was convicted of voluntary manslaughter in August of 2011 and of carrying a loaded firearm in December of 2011. Similarly, Kindorf opined that Mauro Gutierrez was a member of VNS and the Norteño gang in 2011 and 2012. Documents were introduced showing that Gutierrez was convicted of voluntary manslaughter with a gang enhancement in October 2011, a residential burglary in 2006, and twice of unlawfully taking a vehicle in 2006 and 2010.

Kindorf further testified that he had known Jacob Stephens since 2001. Stephens had tattoos of four dots below his right eye, a representation of the number 14 on his hands, and "XIV," "VNS" and "scrap killer" on his torso and abdomen. Kindorf opined that Stephens was an "Norteño gang member part of VNS" on August 5, 2012.

Kindorf was asked a hypothetical question based on the facts of the shooting, including the belief by one Norteño gang member that someone had taken some of his stuff, the gang member asking that person "Man, who you kick it with?," and the first gang member opening fire followed by the second gang member. Kindorf opined that the crime would have been committed for the benefit of the gang.

Dkt. No. 17-19 at 3-5 (Decision in *People v. Capanis,* No. A151544 (April 16, 2019)), as modified

upon denial of rehearing on April 16, 2019, *see* Dkt. No. 11-1 at 50.[1]

The jury found Capanis guilty of first-degree murder committed to further the activities of a

criminal street gang, active participation in a criminal street gang, and possession of a firearm by a

felon.  Sentence enhancement allegations were found true.  He was sentenced to life in prison

without the possibility of parole for the special-circumstance murder in count 1, plus 25 years to life

---

[1] Although Grijalva had been shot with two different guns and only Stephens' gun had been found, the prosecution's theory was that Capanis had fired the shots from the second gun.

United States District Court
Northern District of California

for the gun enhancement on count 1, plus a five-year enhancement for the prior conviction.   Capanis appealed.  The California Court of Appeal affirmed his conviction in March 2019, and the California Supreme Court denied his petition for review in July 2019.

Capanis then filed this federal action for writ of habeas corpus.  He alleges several claims in his amended petition for writ of habeas corpus. Dkt. No. 11.  First, he contends that his right to due process was violated because the evidence was insufficient to support the special-circumstance finding for the first degree murder.   Second, Capanis alleges that he was denied his Sixth Amendment right to present a defense when the trial court excluded certain helpful evidence, rejected jury instructions on self-defense, and interrupted defense counsel's closing argument to tell the jury that there was no self-defense in the case.  Third, Capanis contends that the admission of evidence of his prior criminal conduct violated his right to due process.  Fourth, Capanis contends that the denial of his request for a jury instruction that the jury could consider evidence of his good character violated his Sixth and Fourteenth Amendment rights to present a defense and to due process.  Fifth, he contends that the admission of witness Navarro's testimony about a rumor Navarro heard violated Capanis' right to due process.

The court ordered respondent to show cause why the amended petition should not be granted.  Respondent filed an answer and Capanis filed a traverse.  The matter is now ready for decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Contra Costa County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id*. at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'"  *Id*. at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991).  When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale.  It should then presume that the unexplained decision adopted the same reasoning."  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Section 2254(d) generally applies to unexplained as well as reasoned decisions.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be

presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

## DISCUSSION

A. A Brief Explanation of the Gang Enhancements and Gang Offense

Several of the claims presented involve the gang enhancements and a gang-based substantive crime. It thus is useful to understand the three ways the gang connection impacted this case before turning to the merits of the claims. The first way was that Capanis received a life-without-parole sentence, rather than the more common 25-years-to-life sentence, because a special circumstance was found true for the murder. *See* Cal. Penal Code §§ 187, 190.2(a)(22). The special circumstance was that "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." *Id.* at § 190.2(a)(22). Section 186.22(f), in turn, defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." *Id.* at § 186.22(f). The enumerated criminal acts include robbery, grand theft, carrying a concealed firearm, and carrying a loaded firearm. *Id.* at § 186.22(e)(2, 9, 32, 33).

The jury instruction for the special circumstance required the People to prove beyond a reasonable doubt that: "[1.] The defendant committed First Degree Murder . . . ; [2.] At the time of the killing, the defendant was an active participant in a criminal street gang; [3.] The defendant

6

knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; and [4.] The murder was carried out to further the activities of the criminal street gang." Dkt. No. 17-4 at 275 (CALCRIM 736) (brackets added).

The second way the gang connection impacted the case was that the jury found true the criminal street gang allegation under California Penal Code § 186.22(b) for the murder. That subsection provides for a longer sentence for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." *Id.*

The jury instruction for the gang enhancement allegation required the People to prove beyond a reasonable doubt that: "[1.] The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; and [2.] By committing the offense the defendant intended to assist, further, or promote criminal conduct by gang members." Dkt. No. 17-4 at 271-72 (CALCRIM 1401) (brackets added).

The third way the gang connection impacted the case was that Capanis was convicted of the substantive offense under California Penal Code § 186.22(a). That section provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years." *Id.*

The jury instruction for the substantive offense required the People to prove beyond a reasonable doubt that: "[1.] The defendant actively participated in a criminal street gang; [2.] When the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; and [3.] The defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang" by committing the murder. Dkt. No. 17-4 at 278 (CALCRIM 1400) (brackets added).

For the two enhancements and the substantive offense, the prosecution was required to prove the existence of the gang and the pattern of gang activity. The California Supreme Court explained:

> The STEP Act [criminalizing gang activity] defines a "criminal street gang" as an "ongoing organization, association, or group." (§ 186.22(f).) That "group" must have "three or more persons," and its "primary activities" must consist of certain crimes. (*Ibid.*) The same "group" must also have "a common name or common identifying sign or symbol," and its members must be proven to have engaged in a "pattern of criminal activity" by committing predicate offenses.

*People v. Prunty*, 62 Cal. 4th 59, 71 (Cal. 2015).  Another California Supreme Court case explained the "pattern" requirement for gang cases:

> A gang otherwise meeting the statutory definition of a "criminal street gang" . . . is considered a criminal street gang under the STEP Act only if its members "individually or collectively engage in or have engaged in a pattern of criminal gang activity" (§ 186.22, subd. (f)) by "the commission, attempted commission, or solicitation of *two or more*" (italics added) of the statutorily enumerated offenses within the specified time frame.

*People v. Gardeley*, 14 Cal. 4th 605, 621 (Cal. 1996), *disapproved on other grounds in People v. Sanchez*, 63 Cal. 4th 665 (Cal. 2016).  The predicate offenses for a pattern need not have been committed for the benefit of, at the direction of, or in association with the gang, *id.,* but those offenses must have been committed by members of the gang.  *Prunty*, 62 Cal. 4th at 71.  The prosecution also must show defendant had knowledge of such a pattern of criminal activity.  Dkt. No. 17-19 at 18 (Decision) (quoting § 186.22(a)); *see also* CALCRIM No. 736.

B.  <u>Sufficiency of the Evidence for the Special Circumstance Finding for the Murder</u>

1.  <u>Background</u>

Capanis contends that his right to due process was violated because there was insufficient evidence to support the finding that the murder was committed with the special circumstance that it was carried out by an active participant in a criminal street gang and was carried out to further the activities of the criminal street gang.  Specifically, he urges that the other people allegedly in his gang were actually in a different gang; that is, he contends that his accomplice in the murder and the individuals involved in the predicate offenses were in the VNS gang subset that was not adequately connected to his Norteño gang.

As mentioned in the preceding section, a defendant may receive a sentence of life in prison without the possibility of parole or the death penalty if the jury funds that the defendant "intentionally killed the victim while the defendant was an active participant in a criminal street

gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."  Cal. Penal Code § 190.2(a)(22).

The California Court of Appeal rejected Capanis' contention that there was insufficient evidence to support the special circumstance.  The court was "doubtful" about Capanis' argument that the reference in Section 190.2(a)(22) to Section 186.22(f) actually meant that each of the elements in Section 186.22(a) had to be met, given that the special circumstance statute referred to subdivision (f) rather than subdivision (a) of Section 186.22.  Dkt. No. 17-19 at 29 (Decision).  Next, the state appellate court determined that, even if the elements of Section 186.22(a) had to be met for the jury to make the special-circumstance finding under Section 190.2(a)(22), Capanis had not shown there was insufficient evidence to support that finding.  Dkt. No. 17-19 at 29-30.  Capanis had contended on appeal that the "criminal street gang" requirement was not satisfied because "the prosecution failed to prove the requisite organizational connection between VNS and the Norteño gang" under *People v. Prunty*, 62 Cal. 4th 59 (Cal. 2015).  Dkt. No. 17-19 at 25.  In *Prunty*, the California Supreme Court had held that, "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." *Prunty*, 62 Cal. 4th at 71.  "In general, evidence that shows subset members have communicated, worked together, or share a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang."  *Id.* at 78-79 (quoted in Dkt. No. 17-19 at 25 (Decision)).[2]  The California Court of Appeal concluded that there was sufficient evidence under *Prunty* of the connection between VNS and the Norteño gang.  Sergeant Kindorf described the subsets such as VNS as "neighborhood chapters" of the Norteño gang.  Dkt. No. 17-19 at 26.

> Norteño subsets, including VNS, attend meetings known as "juntas" where they discuss how they are going to implement the "dictates" of the larger organization, including, for example, which subsets are going to operate in which areas and who will have control over the drug trade in a particular area.  The East Bay "regiment"

---

[2] *Prunty* was not squarely on point, as it addressed the question of linking one subset of a larger gang to another subset of that larger gang, whereas the facts in Capanis' case concerned the simpler problem of linking a subset to the larger gang.

United States District Court
Northern District of California

of the Norteños, which includes Contra Costa County, operates under the direction of a regimental commander who reports to the state-level organization.  Kindorf twice testified that VNS was part of the overall Norteño umbrella.

In the first place, Capanis' argument that Stephens, Hernandez, and Gutierrez were only shown to be members of VNS and not the Norteños is somewhat overstated. With respect to Hernandez, Kindorf opined that he was an "active member and participant of the Norteño gang, and specifically Varrio North Side," and repeatedly gave his opinion that Hernandez was a member of both VNS and the Norteños. Similarly, Kindorf testified that Gutierrez was a member of "VNS and the Norteño gang."  And Kindorf opined that Stephens was a "Norteño gang member part of VNS" and a "Norteño" on August 5, 2012.

In any event, we find that Kindorf's testimony was sufficient to demonstrate the required "associational and organizational connection" between the Norteños and the VNS subset.  In particular, Kindorf's testimony that VNS was a subset controlling a specific geographic area, and that it reported to the state-level Norteño organization through "juntas" demonstrated that VNS is part of a "loose approximation of a hierarchy." (*See Prunty, supra*, 62 Cal.4th at p. 77.)  And Kindorf's testimony that the various Norteño subsets coordinated to split control of the drug trade reflects a "degree of collaboration, unity of purpose, and shared activity" to benefit the larger organization.  (*Id.* at p. 78.)  While not overwhelming, we conclude that this was substantial evidence in support of the finding that there was an "associational and organizational" connection between the VNS subset and the Norteños.

Dkt. No. 17-19 at 25-27 (Decision).


2.  Analysis

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A court reviewing a conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the evidence is insufficient.  *See Jackson*, 443 U.S. at 324.  The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).

The *Jackson* standard also applies to state sentence enhancements: a petitioner can obtain habeas relief if no rational trier of fact could find the elements of the enhancement true beyond a reasonable doubt. *Garcia v. Carey*, 395 F.3d 1099, 1102 (9th Cir. 2005), *overruled on other grounds as stated in Emery v. Clark*, 643 F.3d 1210, 1215 (9th Cir. 2011).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable." *Id.* at 651 (internal quotation marks omitted).

The *Jackson* standard is applied to a crime as that crime is defined by state law. *Jackson*, 443 U.S. at 324 n.16. The California Supreme Court's interpretation of California law is binding in this federal habeas action. *See Hicks v. Feiock*, 485 U.S. 624, 629-30 (1988).

Here, the California Court of Appeal reasonably rejected Capanis' claim that the evidence was insufficient to link him to the other people in a single criminal street gang. Capanis does not dispute that the evidence showed he was a Norteño. He contends instead that the other three men used to support the special-circumstance finding were not in the Norteño gang. *See* Dkt. No. 11-1 at 26 ("Capanis was a Norteño, not a member of VNS. However, his accomplice in the shooting was a member of VNS as were the two individuals who committed the predicate offenses.") Detective Kindorf's testimony provided sufficient evidence to show that the three other men also were in fact members of the Norteño gang. Kindorf testified that Alonzo Hernandez was in both the VNS gang subset and the Norteño gang, as were Mauro Gutierrez and Jacob Stephens. Dkt. No. 17-14 at 136-38, 140, 148-49 (RT 1353-55, 1357, 1365-66). Based on the evidence that these three men were in the Norteño gang, a rational trier of fact could find the elements of the special circumstance murder proven true beyond a reasonable doubt.

Because there was evidence that Hernandez, Gutierrez, and Stephens were in the Norteño gang along with Capanis, the jury properly could look to the predicate acts committed by them to determine that the prosecution had proven beyond a reasonable doubt that the Norteño gang was a

criminal street gang whose "members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  Cal. Penal Code § 186.22(f).  The California Court of Appeal's reliance on this evidence to reject the challenge to the sufficiency of the evidence was a reasonable application of the standard from *Jackson v. Virginia*, 443 U.S. at 319, which requires the reviewing court to examine the evidence in the light most favorable to the prosecution in determining whether a rational trier of fact could have found the essential elements of a crime proven beyond a reasonable doubt.  The fact that these men had dual membership in both the larger Norteño gang and the VNS subset does not negate the evidence that they were in the Norteño gang.  In light of the evidence that they were members of the Norteño gang, this court need not also consider whether the evidence sufficed under the *Prunty* framework to also show that, as members of VNS, they also should be considered members of the Norteño gang based on the associational or organizational connection that the California Court of Appeal determined was sufficient to unite the Norteño gang and VNS subset to consider them part of a single gang.

It was not an unreasonable application of *Jackson* for the California Court of Appeal to conclude that there was sufficient evidence to permit the jurors to draw the reasonable inference that the three people (Hernandez, Gutierrez, and Stephen) were members of the Norteño gang.  It cannot be said that the California Court of Appeal's rejection of Capanis' due process challenge to the sufficiency of the evidence was "objectively unreasonable."  *See Coleman*, 566 U.S. at 651.  Capanis therefore is not entitled to the writ of habeas corpus on this claim.

C.  Admission of Evidence Of Capanis' Past Convictions

1.  Background

Capanis contends that the admission of evidence of his past convictions violated his right to due process.

At trial, the prosecution presented evidence of Capanis' past four convictions as part of its case-in-chief.  Dkt. No. 17-19 at 16 (Decision).  These convictions were presented as predicate offenses necessary to establish a "pattern of criminal gang activity," a required element of each of the three gang-related allegations (i.e., enhancement, special circumstance, and substantive gang

offense (Count 2)), and to establish the knowledge requirement, which requires defendant to have known that members of that gang "engage in, or have engaged in a pattern of criminal gang activity." *Id.* at 18.

The first conviction was for carrying a concealed firearm in October 2004. Dkt. No. 17-13 at 49 (RT 1140); Dkt. No. 17-19 at 17 (Decision). Martinez Police Officer Kevin Busciglio, the arresting officer in October 2004, testified regarding the event. Dkt. No. 17-13 at 43 (RT 1134). Officer Busciglio testified that Capanis was found in possession of a gun and had given a statement following his arrest, explaining that a "Brandon" had asked Capanis to hold the gun for him. *Id.* at 43, 46 (RT 1134, 1137). Though Officer Busciglio stated he did not recollect Capanis telling him that the "Brandon" was Brandon Arroyo, a verified VCN Norteño gang member, he testified that he (Busciglio) was eventually able to identify the person. *Id.* at 44, 47 (RT 1135, 1138).

The second conviction was for carrying a loaded firearm in December 2004. Dkt. No. 17-13 at 77 (RT 1168); Dkt. No. 17-19 at 17 (Decision). Martinez Police Officer Steven Gaul, the arresting officer in December 2004, testified regarding the event. Dkt. No. 17-13 at 66, 71 (RT 1157, 1162). Officer Gaul's statement prepared following the arrest was admitted in part as a past recollection recorded, and it stated:

> I asked Capanis why he was in possession of the firearm. He said that he had recently been accused of stealing a Glock .45 from an acquaintance. However, he was not the one who stole the gun. He said there was a group of subjects from the city of Antioch who were looking for him because they believed he stole the gun. He said these subjects were going to hurt him and he was in possession of the gun for his protection.

*Id*. at 75 (RT 1166). Officer Gaul testified that he did not recall Capanis identifying the "group of subjects" as the Antioch Norteños. *Id.* at 75-76 (RT 1166-67).

The third conviction was for a felony grand theft in September 2005. Dkt. No. 17-12 at 70-71 (RT 982-83); Dkt. No. 17-19 at 17 (Decision). Terry Gross, a UPS delivery person who witnessed the theft, testified about the crime. Dkt. No. 17-12 at 55 (RT 967). Gross testified that, as he was making his deliveries on the day of the theft, he saw a car with a man in the passenger seat with a red bandanna over his face. *Id.* at 56. He further testified that he then saw another man wearing a dark hoodie exit a residence with "two elongated cases" and get into the same vehicle.

*Id.* at 57-58.  Gross, to the best of his recollection, had identified one man as Caucasian and the other as Hispanic.  *Id.* at 58.  Although he first stated that he did not remember which man was wearing the bandanna, *id.* at 58, Gross later reviewed the police report and testified that he then remembered that both men "had their faces covered," *id.* at 60.  Specifically, he testified that the face coverings were both red bandannas.  *Id.* at 60.[3]

The final conviction was for armed robbery in March 2007.  Dkt. No. 17-19 at 17 (Decision).  The prosecution called on David Riley, a former verified Northern Structure member and Capanis' "friend" who was also convicted for the same March 2007 robbery, to testify regarding his and Capanis' involvement with the Norteños at the time of their conviction.  Dkt. No. 17-12 at 15, 35-36 (RT 927, 947-48).  Riley testified that he had been classified as a Northerner only for purposes of housing once he arrived at prison and that he had not identified as a Norteño or even a Northerner.  *Id.* at 21-23 (RT 933-35).  He further testified that there were significant differences between a Northerner and a Norteño, which is that "once a Norteño, you are like in the street gang . . . . You[, as a Northerner,] are just a guy . . . who doesn't want to get beat up or remain in prison."  *Id.* at 24 (RT 936).  The prosecution also called on California Department of Corrections and Rehabilitation ("CDCR") Gang Investigator Sergeant Casey Walsh, its expert, who testified that "Northern Structure and Norteño had a 'synonymous' meaning."  Dkt. No. 17-19 at 124 (quoting Dkt. No. 17-12 at 124 (RT 1036)).

Sergeant Walsh further testified, based on official incident reports, that in 2009 he and Capanis discussed Capanis' Huelga bird tattoo, a symbol commonly associated with the Norteño gang, which, according to Sergeant Walsh, Capanis said he had received years ago in the county jail or youth authority.  Dkt. No. 17-12 at 162-63 (RT 1074-75).

For all four convictions, the California Court of Appeal held they were relevant as to the existence of predicate offenses needed to show a pattern of criminal activity and not so prejudicial as to warrant exclusion under Evidence Code Section 352.  Dkt. No. 17-19 at 20 (Decision).  The

---

[3] Gross later clarified that two men had exited the residence and entered the vehicle.  Dkt. No. 17-12 at 62 (RT 974).  Whether the man in the dark hoodie was one of the two men who wore a bandanna is unclear from the record.

United States District Court
Northern District of California

court noted "[i]t was for the jury to decide [on the balance of the evidence submitted] whether Capanis was a member of the Norteño gang at the time of the . . . conviction[s] and to weigh the evidence of those convictions accordingly." *Id.* at 19. And "to the extent that the jury concluded that Capanis himself was a Norteño member at the time the crimes were committed, they were relevant as predicate offenses and to demonstrate a pattern of criminal activity by the Norteño gang." *Id.* The court further noted, "the jury could infer, given the balance of the evidence, that . . . Capanis' gang membership predated [his] validation in prison." *Id.* at 20.

Although the California Court of Appeal did not discuss the federal constitutional claim presented to it, the decision is presumed to be a rejection of the federal constitutional claim on the merits. *See Harrington v. Richter*, 562 U.S. at 99. Thus, this court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

2. <u>Analysis</u>

The U.S. Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991); *id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

In *Estelle v. McGuire*, the defendant was on trial for murder of his infant daughter after she was brought to a hospital and died from numerous injuries suggestive of recent child abuse. Defendant told police the injuries were accidental. Evidence was admitted at trial that the coroner discovered during the autopsy older, partially healed injuries that had occurred six to seven weeks before the child's death. *Id.* at 65. Evidence of the older injuries was introduced to prove "battered child syndrome," which "exists when a child has sustained repeated and/or serious injuries by nonaccidental means." *Id.* at 66. The state appellate court had held that the proof of prior injuries tending to establish battered child syndrome was proper under California law. *Id.* In federal habeas proceedings, the Ninth Circuit found a due process violation based in part on its determination that

15

1    the evidence was improperly admitted under state law.  *Id.* at 66-67.  The U.S. Supreme Court first

2    held that the Ninth Circuit had erred in inquiring whether the evidence was properly admitted under

3    state law because "federal habeas corpus relief does not lie for errors of state law."  *Id.* at 67 (internal

4    quotes removed).  The U.S. Supreme Court then explained:

> The evidence of battered child syndrome was relevant to show intent, and nothing in
> the Due Process Clause of the Fourteenth Amendment requires the State to refrain
> from introducing relevant evidence simply because the defense chooses not to
> contest the point.  [¶]  Concluding, as we do, that the prior injury evidence was
> relevant to an issue in the case, we need not explore further the apparent assumption
> of the Court of Appeals that it is a violation of the due process guaranteed by the
> Fourteenth Amendment for evidence that is not relevant to be received in a criminal
> trial.  We hold that McGuire's due process rights were not violated by the admission
> of the evidence.  *See Spencer v. Texas*, 385 U.S. 554, 563–564, 87 S. Ct. 648, 653–
> 654, 17 L.Ed.2d 606 (1967) ("Cases in this Court have long proceeded on the premise
> that the Due Process Clause guarantees the fundamental elements of fairness in a
> criminal trial . . . .  But it has never been thought that such cases establish this Court
> as a rulemaking organ for the promulgation of state rules of criminal procedure").

12   *Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

13       The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of

14   prior convictions did not violate due process.  The U.S. Supreme Court explained in *Spencer* that,

15   although there may have been other, perhaps better, ways to adjudicate the existence of prior

16   convictions (e.g., a separate trial on the priors after the trial on the current substantive offense

17   resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial" did

18   not violate due process.  *Id.* at 563-64.  "In the face of the legitimate state purpose and the long-

19   standing and widespread use that attend the procedure under attack here, we find it impossible to

20   say that because of the possibility of some collateral prejudice the Texas procedure is rendered

21   unconstitutional under the Due Process Clause as it has been interpreted and applied in our past

22   cases."  *Id.* at 564.

23       *Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in support

24   of the conclusion that the introduction of the battered child syndrome evidence did not so infuse the

25   trial with unfairness as to deny due process of law.  *See Estelle v. McGuire*, 502 U.S. at 75.  In

26   *Lisenba*, the U.S. Supreme Court rejected a claim that the admission of inflammatory evidence

27   violated the defendant's due process rights.  The evidence at issue in *Lisenba* was live rattlesnakes

28   and testimony about them to show they had been used by the defendant to murder his wife.  "We do

United States District Court
Northern District of California

16

not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence.  We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law.  The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process."  *Lisenba*, 314 U.S. at 228-29.

These three U.S. Supreme Court cases declined to hold that the admission of prejudicial or propensity evidence violates the defendant's due process rights.  No U.S. Supreme Court cases since *Estelle v. McGuire* have undermined the holdings in these three cases.  In other words, there is no U.S. Supreme Court case holding that the admission of prejudicial or propensity evidence violates due process.

The U.S. Supreme Court has, however, established a general principle of "fundamental fairness," i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process.  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (due process was not violated by admission of evidence to identify perpetrator and link him to another perpetrator even though the evidence also was related to crime of which defendant had been acquitted)).  Thus, a federal habeas court may consider whether the evidence was "so extremely unfair that its admission violates 'fundamental conceptions of justice.'"  *Id.*

In this circuit, the admission of prejudicial evidence may make a trial fundamentally unfair and violate due process "[o]nly if there are no permissible inferences the jury may draw from the evidence."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).  "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions.  Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose."  *Id.* (internal citation and footnote omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14

Here, the California Court of Appeal could have reasonably determined that the admission of Capanis' four prior convictions was not so extremely unfair as to violate fundamental conceptions of justice and due process. *See Dowling*, 493 U.S. at 352. As mentioned earlier, for the gang special circumstance, the gang enhancement, and the substantive gang offense, the prosecution had to prove that members of the gang either engage or have engaged in a "pattern of criminal activity" by committing predicate offenses. *See Prunty*, 62 Cal. 4th at 71. The predicate offenses had to be committed on separate occasions, or by two or more persons. *See Gardeley*, 14 Cal. 4th at 620-21. Critically, the defendant himself could have been the person committing the predicate offenses, if he was a gang member at the time. *See* Dkt. No. 17-19 at 19 (Decision), citing *People v. Tran*, 51 Cal. 4th 1040, 1046 (Cal. 2011) (predicate offense can be established by proof of an offense committed by defendant on a prior occasion). There were permissible inferences that could be drawn about each of the prior convictions, namely that Capanis had committed a predicate offense and done so when he was in the Norteño gang, which helped the prosecution meet its burden to show a pattern of criminal gang activity.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

The California Court of Appeal reasonably could have determined that evidence of the October 2004 firearm-possession offense did not violate due process because it was relevant to the existence of a pattern of criminal activity by the Norteño gang, and that pattern was required for the gang enhancement allegations and the substantive gang offense. The evidence regarding the October 2004 offense—in addition to its commission—included testimony that would have allowed a reasonable inference that Capanis himself was a member of the Norteño gang at the time he committed this offense in October 2004. According to Sergeant Walsh, Capanis had stated in 2009 that he had received his Huelga bird tattoo "years ago" while in a county jail or Youth Authority facility, which Sergeant Walsh thought was "numerous years" ago, although Sergeant Walsh could not recollect the exact number of years. Dkt. No. 17-12 at 162-63 (RT 1074-75). It would have been permissible to infer that the tattoo, commonly associated with the Norteños, that Capanis said he had received "years ago" while in a county jail or Youth Authority facility was in existence five years earlier, in 2004. Further supporting the inference that Capanis was a Norteño in October 2004 was the evidence submitted showing that Capanis' relationship with Brandon Arroyo, a verified

VCN and Norteño gang member, was significant enough for Capanis to hold a firearm for him in October 2004.  Dkt. No. 17-13 at 46 (RT 1137).

With respect to the second gun conviction—carrying a loaded firearm in December 2004—it would have been permissible to also infer that Capanis was at that time a member of the Norteño gang for similar reasons as for the October 2004 conviction.  In addition to the Huelga bird tattoo evidence mentioned above, there was testimony from Officer Gaul that Capanis mentioned a fear of "a group of subjects from the city of Antioch" and that the regional Antioch Norteños existed and operated in that city.  *Id.* at 75 (RT 1166).  Although it is true that Officer Gaul testified that he did not recall Capanis specifically identifying the "group of subjects" as the Antioch Norteños, the California Court of Appeal rightly points out that the actual weighing of evidence and its probative value is up to the jury.  It would not have been an unreasonable application of clearly established federal law for the California Court of Appeal to conclude that the admission of the December 2004 conviction did not violate fundamental conceptions of justice and due process.

The third conviction, for a September 2005 grand theft, requires a slightly different analysis.  Although three men were ultimately arrested for the theft of the rifles and Capanis was convicted, witness Gross testified that he noticed only two of the men with their faces covered with red bandannas.  Dkt. No. 17-12 at 60 (RT 972).  Still, regardless of whether Capanis himself was wearing a red bandanna that day, it was permissible to infer that Capanis was at least working in conjunction with persons associated with the Norteño gang given the testimony regarding the two men with red bandannas, *id.*, and another witness' testimony that the Norteño gang adopted the color red as a symbol, Dkt. No. 17-9 at 22 (RT 422).  This would have supported an inference that the predicate offense was committed by Norteño gang members.  And the reasonableness of this inference would have been strengthened by evidence of the Huelga bird tattoo that Capanis had received "years ago" when asked about it in 2009.  It would not have been an unreasonable application of clearly established federal law for the California Court of Appeal to conclude that the admission of the September 2005 felony grand theft was not so extremely unfair as to violate fundamental conceptions of justice and due process.

Last, with respect to the fourth conviction, for a March 2007 armed robbery, Capanis was convicted along with witness Riley, a verified Northern Structure member, for the crime.  A permissible inference was that this was a predicate act showing a pattern of criminal activity by the gang because the evidence showed that Capanis was at least working in conjunction with a person associated with the Norteño gang given the testimony that Riley was eventually validated or verified as a Northern Structure member because, as the California Court of Appeal explained, "the jury could infer, given the balance of the evidence, that Riley and Capanis' gang membership predated their validation in prison."  Dkt. No. 17-19 at 19-20 (Decision).  Because there were permissible inferences to be drawn from the March 2007 armed robbery evidence, it would not have been an unreasonable application of clearly established Supreme Court precedent for the California Court of Appeal to conclude that the admission of the evidence was not so extremely  unfair as to violate due process.

D.  Admission of Evidence About Nestor Navarro's Fear

1.  State Court Proceedings

As mentioned earlier, there was evidence that Nestor Navarro witnessed the shooting and, separately, was called to pick up the kidnapping victim the day before the shooting.  Before trial, Capanis moved to preclude Navarro from testifying that he heard a rumor that Capanis' girlfriend had offered a reward for information about Navarro.  The trial court denied the motion in limine, finding that the evidence was relevant to Navarro's state of mind and willingness to testify.

During trial, Navarro testified that "[s]omebody came to my house and told me that [Capanis' girlfriend] was offering money to give them information about who I was." Dkt. No. 17-10 at 76 (RT 644).[4]  He also expressed his dislike for testifying in court, explaining that he didn't want to "be watching' over [his] shoulders."  Dkt. No. 17-9 at 134 (RT 534); *see also* Dkt. No. 17-10 at 76 (RT 644).  The trial court gave this limiting instruction when the evidence was admitted:

---

[4] Although the actual words were that a reward was offered for information "about who I was," the parties and the state court treated the evidence as being a reward for information about whereabouts of Navarro, who relocated at some point before the trial with financial assistance from the government. *See* Dkt. No. 17-19 at 20-21 (Decision).

> this [testimony] is information that is only relevant to one issue, and it is limited to that issue, that issue being the witness' state of mind in terms of his testimony and any bias or motives he may have in connection with his testimony here.  It's not necessarily any indication of anything relating to Mr. Capanis or anything that he has done.  It's solely for the purpose of your making a decision as to the witness' frame of reference and frame of mind as he testifies here yesterday and today.

*Id.*  The trial court again gave a limiting instruction for this evidence at the end of trial.  *See* Dkt. No. 17-16 at 54-55 (RT 1586-87).

The California Court of Appeal concluded that, "[w]hether the rumor was corroborated or not, the fact that Navarro heard it was relevant to his state of mind and his willingness to testify. . . . The jury was twice instructed not to consider the testimony for any purpose other than Navarro's state of mind.  There was no abuse of discretion" under California Evidence Code Section 352.  Dkt. No. 17-19 at 21 (Decision).

Although the California Court of Appeal did not discuss the federal constitutional claim presented to it, the decision is presumed to be a rejection of the federal constitutional claim on the merits.  *See Harrington v. Richter*, 562 U.S. at 99.  Thus, this court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Id.* at 102.

### 2.  Analysis

The same legal principles from the preceding section apply here with respect to the admission of evidence of the rumor Navarro heard and his fear.  That is, evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process.  *Dowling*, 493 U.S. at 352.  In this circuit, admission of prejudicial evidence may make a trial fundamentally unfair and violate due process "[o]nly if there are no permissible inferences the jury may draw from the evidence."  *Jammal*, 926 F.2d at 920.

"Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest.  Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy

and truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52 (1984); *see, e.g., id.* (applying Federal Rules of Evidence and holding that witness' membership in the same prison gang as defendant supported the permissible inference that witness' testimony "was slanted or perhaps fabricated in respondent's favor"); *King v. Vazquez*, No. 15-cv-03260, 2017 WL 4156145, at *8 (N.D. Cal. Sept. 18, 2017) ("[b]y learning that Mr. Villanueva recently had been threatened, the jury might be more understanding of his hostile body language and give greater weight to those statements made before unidentified hoodlums attacked him just days before trial and told him to keep his mouth shut.").

Here, Navarro's awareness of the rumor that Capanis' girlfriend offered a reward for information about Navarro was relevant to Navarro's state of mind. Capanis conceded this point and acknowledged that Navarro's testimony could have been relevant to his credibility. Dkt. No. 11-1 at 46-47 (Pet. for Review at Cal. Supreme Court).

Though Capanis argues that the rumor was never corroborated or confirmed to be true, this did not matter, as the California Court of Appeal reasonably concluded. The mere fact that Navarro heard such a rumor and was affected by it was enough to establish relevance to his state of mind. Navarro's testimony shows that he was mindful of potential retaliation, even prior to hearing the rumor. *See* Dkt. No. 17-9 at 133-34 (RT 533-34) ("Q. Can you describe to me why you didn't want to put other people's names in the mix? A. Just not trying to get nobody else in the same situation I got myself into . . . Just, you know, that I be watchin' over my shoulders now"). The jury reasonably could have inferred that Navarro was apprehensive about potential repercussions of making any statements against Capanis, and that learning that a reward had been offered for information about him would make him even more frightened about making statements and testifying.

Capanis also argues that the evidence made his trial fundamentally unfair because it may have led jurors to fear Capanis. He asserts that evidence that his girlfriend had put out a reward to find Navarro might be seen as an effort by Capanis to intimidate Navarro. In his view, a suggestion that Capanis was trying to intimidate Navarro made his trial fundamentally unfair because it made the "jurors actually fear[] personal harm," and thus "put before the jurors extraneous matters

affecting the guilty verdict." Dkt. No. 11-1 at 47 (Pet. for Review in Cal. Supreme Court). The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based only on the evidence presented at trial. *See Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965).

Capanis has not shown that the jury received or considered extrinsic evidence. Capanis instead makes an argument that heaps inference upon inference from the evidence of the rumor— i.e., that the jury could infer that Capanis directed his girlfriend to offer the reward, the jury could use that first inference to then infer that Capanis was trying to intimidate Navarro, and the jury could use that second inference to further infer that Capanis also was a danger to the jury. But Capanis' argument is nothing more than speculation; he does not come close to showing that the jury's verdict was based on evidence not presented at trial. Although the jury did send a note at the end of trial indicating a general concern about juror safety, there is no way to determine that the note was prompted by Navarro's concern rather than all the other gang-related evidence in the case.[5] Moreover, the trial court gave a limiting instruction about the rumor evidence twice. Following the instructions given, the jurors are assumed to have only considered the evidence as it bore upon Navarro's state of mind and any bias or motive he may have had in testifying. Capanis has not provided any reason to depart from the normal presumption that jurors follow the court's instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

The evidence of the rumor and Navarro's fear was not central to the trial in any substantive way, and the trial court made it clear that the evidence could only be considered by the jury for the very limited purpose of understanding Mr. Navarro's state of mind rather than to reflect Capanis' actions or character. Based on this, the California Court of Appeal reasonably could have determined that the admission of the evidence did not violate Capanis' right to due process.

---

[5] During deliberations, the jury sent a note that stated: "How concerned do we need to be re our safety after the trial is over? Do you have suggestions as to what precautions we should take?" Dkt. No. 17-4 at 294 (CT 622).

23

E.  Claims Regarding the Right To Present A Defense

1.  Trial Court Proceedings

Capanis contends that his constitutional right to present a defense was impeded when the trial court excluded two items of evidence, refused to instruct on self-defense, and interrupted the defense counsel's closing argument to say that it had not instructed on self-defense.

The first item of evidence excluded was evidence that, when stopped by a police officer after running from the scene of the shooting, Jacob Stephens said: "They were shooting.  I ran because I was scared."  Dkt. No. 17-8 at 10 (RT 313).  The defense urged that the statement was admissible under the spontaneous-statement exception to the hearsay rule.  *See* Cal. Evid. Code § 1240.  At a pretrial hearing on the admissibility of the evidence, the prosecution elicited testimony that Stephens was observed by the officer running away and discarding an object (later determined to be a gun involved in the shooting), and ignored the officer's command to stop before being tackled and handcuffed by the officer.  Dkt. No. 17-8 at 12-13 (RT 315-16.)  The statement was made as Stephens was being handcuffed and frisked.  *Id.* at 13-14 (RT 316-17.)  The trial court also listened to a recorded interview of Stephens by the police done several hours after Stephens was arrested. The trial court explained that Stephens had provided two explanations during the interview, both of which identified Capanis as the initial shooter:  in one version, Stephens and Capanis were the only people involved and Capanis shot at Stephens, while the other version had Capanis shooting first at Grijalva's group and then shooting at Stephens.  *Id.* at 75 (RT 378).  The trial court then ruled that the statement would not be admitted as a spontaneous statement because it was not made under conditions suggesting reliability.  *Id.* at 73 (RT 376).  Stephens' flight from the police and admissions during the interview suggested to the court that he was not interesting in talking to police or being truthful about anything, and Stephens' extensive criminal history indicated to the court that he was not under such stress on this occasion that would have led him to be truthful.  *Id.* at 73-74 (RT 376-77).  The trial court also ruled that, if the statement was otherwise admissible, it would be excluded under California Evidence Code Section 352 because the probative value would be outweighed by the undue consumption of time due to the need to admit the inconsistent statements in the hours-long interview with the police for impeachment purposes.  Dkt. No. 17-8 at 77-78 (RT

United States District Court
Northern District of California

1    380-81).

2         The second item of excluded evidence was the expected testimony from local resident

3    Shamika Newman that shooting victim Grijalva's "group sold marijuana, and she had seen them

4    with guns" on another occasion.  Dkt. No. 17-4 at 154 (CT 482).  The trial court excluded this

5    testimony because Newman "hasn't specifically identified Mr. Grijalva as that person" who had the

6    gun "or that any of the persons who may have had a gun previously were, in fact, there when the

7    shooting happened."  Dkt. No. 17-8 at 84 (RT 387).  The trial court ruled that there were no rational

8    inferences that could lead to a finding that Capanis acted in reasonable or unreasonable self-defense

9    on the day of the shooting based on evidence that someone in the victim's presence on a previous

10   occasion might have possessed a gun on that previous occasion.  *Id.* at 80-82 (RT 383-85).

11        Although the trial court refused to allow Newman to testify about her observations on earlier

12   occasions, the trial court ruled in limine that Newman could testify that she saw someone remove

13   an object from Grijalva's body immediately after the shooting.  *Id.* at 80 (RT 383).  The court

14   explained that this evidence alone would not be sufficient to show the object was a gun or that there

15   was enough evidence to support a defense of self-defense.  *Id.* at 81-82 (RT 384-85).  The court

16   stated that it would not give a self-defense instruction if the only evidence was that an unidentified

17   object was removed from Grijalva's body after the shooting.  *Id.* at 83 (RT 386).  The defense chose

18   not to call Newman as a witness.

19        The jury instructions did not include an instruction on self-defense.

20        During closing argument, defense counsel made several statements suggesting he was

21   moving toward a self-defense argument (e.g., arguing that the victim's hands had not been tested

22   for gunshot residue and that a witness admitted that Grijalva raised his right hand immediately

23   before being shot) and the prosecution objected.  Dkt. No. 17-16 at 161 (RT 1693).  The trial court

24   sustained the objection and stated:  "Ladies and gentlemen, if the Court believed that there was a

25   self-defense argument to be made in this case, it would have instructed you on self-defense.  You

26   may have noted yesterday, I did not instruct you on that defense."  *Id.*

27        Later, out of the presence of the jury, defense counsel objected that the court's statement

28   during the defense closing argument impeded Capanis' right to due process.  *Id.* at 202-03 (RT 1734-

35).  The court responded that, during the jury instruction conference, defense counsel had not requested a self-defense instruction or argued that one was appropriate.  *Id.* at 203 (RT 1735).  Having failed to do so, defense counsel "could not fly under the radar and suggest to the jury that self-defense is an appropriate defense in a case" where the instruction had not been requested and therefore the jury had no guidance on how to resolve self-defense issues.  *Id.*  The prosecutor chimed in that self-defense was inconsistent with Capanis' defense of misidentification, but the trial court rejected the prosecutor's argument because the defendant was entitled to raise inconsistent defenses.  *Id.* at 204 (RT 1736).  The trial court stated that the "only evidence the jury heard was Mr. Navarro's testimony that Ulysses Grijalva reached out his bare hand to try to shake the hand of the person that was confronting him with a firearm and got shot.  And the Court's view is that that was not sufficient information all by itself, in the absence of anything else, to warrant a self-defense instruction."  *Id.* at 205 (RT 1737).  Defense counsel agreed that he had not requested a self-defense instruction.  *Id.*

### 2.  California Court of Appeal's Decision

The California Court of Appeal rejected Capanis' constitutional and state law challenges to these rulings.  The discussion in the state appellate court's opinion focused on the state law issues.  The state appellate court upheld the exclusion of Stephens' statement during his arrest because the circumstances showing his flight from police, discarding a weapon, and being handcuffed before he made the statement showed that he "had time to 'contrive and misrepresent' and make a statement in his own self-interest or at least the trial court did not abuse its discretion in so concluding."  Dkt. No. 17-19 at 10 (Decision) (quoting *People v. Poggi*, 45 Cal. 3d 306, 318 (Cal. 1988) (to qualify as a spontaneous statement under California Evidence Code Section 1240, the statement must have been made "'before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance.'")).

Next, the California Court of Appeal determined that the trial court did not abuse its discretion in excluding the Shamika Newman statement as character evidence because defense counsel was unable to say that Newman would be able to testify that she had seen Grijalva himself with a gun and instead had indicated that the gun had been held on a prior occasion by an unspecified

person in the group with which he was associated.  "Given the vague nature of this testimony, and the fact that Newman did not identify Grijalva specifically as having possessed a gun at whatever unspecified point in the past, the trial court did not abuse its discretion in declining to admit her testimony" as character evidence to prove conduct in conformity with that character.  *Id.* at 11.

The court of appeal further determined that, because the statements from Newman and Stephens "were the only evidence even arguably supporting a theory of self-defense, the trial court did not err in refusing to so instruct the jury."  *Id.*

The California Court of Appeal denied the federal constitutional claim on the merits without explanation.  This court therefore "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Harrington v. Richter*, 562 U.S. at 102.

### 3.  Analysis of Federal Constitutional Claims

#### a.  Exclusion of Evidence

The U.S. Constitution gives a criminal defendant the right to present a defense.  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted).  The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness.  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute).  A defendant "'does not have an unfettered right to offer [evidence] that is incompetent, privileged or otherwise inadmissible under standard rules of evidence.'"  *Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (plurality opinion) (alteration in original) (quoting *Taylor*, 484 U.S. at 410).  Even relevant evidence

may be excluded on account of certain evidentiary rules.  *See id.* at 42.  "[T]o say that the right to introduce relevant evidence is not absolute is not to say that the Due Process Clause places *no* limits upon restriction of that right"; rather, it means that the defendant has the heavy burden to show that the decision to exclude evidence "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Id.* at 42-43 (citation omitted).  If the exclusion of evidence is found to be constitutional error, it is subject to harmless-error analysis.  *See Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010).  Habeas relief is not available unless the erroneous exclusion had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

"Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."  *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).  In *Jackson*, the Supreme Court identified four cases where it had found such a violation:  *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Rock v. Arkansas*, 483 U.S. 44 (1987); *Chambers v. Mississippi*, 410 U.S. 284; and *Washington v. Texas*, 388 U.S. 14.

In *Holmes v. South Carolina*, 547 U.S. 319, the Supreme Court held that a criminal defendant's right to present a defense was violated by an evidence rule under which a defendant could not introduce proof of third-party guilt if the prosecution had introduced forensic evidence that, if believed, would strongly support a guilty verdict.  The constitutional problem was that the general rule (i.e., allowing a defendant to offer evidence of third-party guilt if the evidence was inconsistent with his own guilt and was not speculative) had been "radically" changed by the South Carolina Supreme Court to be contingent on the strength of the prosecution's case.  *Id.* at 328.  That radical change caused South Carolina's rule to cease to rationally serve the end that the general rule was "designed to promote, i.e., to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues."  *Id.* at 330.

In *Rock v. Arkansas*, 483 U.S. 44, the Supreme Court held that Arkansas' *per se* rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict a defendant's right to testify.  "A State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of

United States District Court
Northern District of California

a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." *Id.* at 61.

In *Chambers v. Mississippi*, 410 U.S. 284, the Supreme Court held that the defendant was denied a fair trial when the state's evidentiary rules prevented him from calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime. It was the combination of the rigid application of the State's evidence rules and the fact that the proffered evidence bore considerable assurances of trustworthiness and reliability that led to the due process violation in *Chambers*. *See id.* at 302-03. The Supreme Court specifically pointed out that its holding did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Id.*

The challenged rule in *Washington v. Texas,* 388 U.S. at 15, provided that principals, accomplices and accessories in the same crime could not be used as witnesses for each other. This rule violated a defendant's right to compulsory process because "the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id.* at 23.

The California Court of Appeal's rejection of Capanis' claim was not contrary to, or an unreasonable application of, these Supreme Court holdings. Capanis does not show that either of the California rules at issue—i.e., the spontaneous statement hearsay exception and the rule regarding character evidence—"offend[] some 'fundamental principle of justice'" such that the rules themselves violate a criminal defendant's right to due process. *See Egelhoff*, 518 U.S. at 43. The two evidentiary rulings were routine applications of routine evidentiary rules regarding character evidence and regarding the spontaneous statement exception to the hearsay rule.

1. Statement Made by Jacob Stephens Upon His Arrest

Capanis has not identified any Supreme Court holding that the right to present a defense or right to due process includes a right to present hearsay evidence that does not come within an exception to the hearsay rule, such as the exception for spontaneous statements. The evidence in

United States District Court
Northern District of California

question was a self-exculpatory statement made by a person who had been handcuffed after trying to flee from police and who had just discarded his weapon while running away from a shooting. In the exercise of his right to present a defense, "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed." *Chambers*, 410 U.S. at 302. Whereas the statement excluded in *Chambers* "bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest," *id.*, there was no such showing for Stephens' statement made during his arrest after he had tried to flee from the police. The California Court of Appeal reasonably could conclude that, unlike the situation in *Chambers*, the hearsay rule had not been applied "mechanistically to defeat the ends of justice." *Id.* It would not have been an unreasonable application of Supreme Court precedent for the California Court of Appeal to conclude that Capanis' right to present a defense was not violated by the exclusion of a hearsay statement made under circumstances not suggesting the statement was trustworthy.

Capanis argues that the trial court should not have looked at Stephens' statements during his later police interview to retrospectively determine whether Stephens' statement was a spontaneous statement. *See* Dkt. No. 18 at 7. Regardless of whether this is correct as a constitutional matter, the circumstances immediately surrounding the statement amply supported the finding that it was not a spontaneous statement. Trustworthiness of the statement is critical to the spontaneous statement hearsay exception under California law. *See Poggi*, 45 Cal. 3d at 318 ("'the foundation for this exception is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury'" because it is thought the stress of nervous excitement overtakes reflective faculties "and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief"). Capanis points out that Stephens "appeared scared and was breathing hard from exertion." Dkt. No. 18 at 7. That physical state was, however, at least as consistent with being the consequence of Stephens

being tackled by the officer he was trying to run away from and realizing that he had just been caught red-handed by an officer who happened to be nearby when the shooting occurred. Under the circumstances, the state court reasonably could conclude that Stephens' statement to the police officer was more likely to be a statement calculated to avoid criminal prosecution for the shooting— much like when a suspect protests "I didn't do it" or "he started it" when nabbed fleeing from the scene of a crime—than a trustworthy recitation of the circumstances of the shooting itself. *Cf. United States v. Thomas*, 105 F. App'x 773, 780-81 (6th Cir. 2004) (district court properly refused to admit, as an excited utterance, defendant's statement to police that he had been carjacked when he was apprehended driving away from a bank robbery); *People v. Jurian*, 2018 WL 1100763, at *23 (Cal. Ct. App. 2018) (unpublished) ("Courts have routinely disallowed alleged excited utterance testimony where the declarant had a reason to lie."). It would not have been an unreasonable application of Supreme Court precedent for the California Court of Appeal to conclude that Capanis' right to present a defense was not violated by the exclusion of this hearsay statement made under circumstances not suggesting the statement was trustworthy.

### 2. Shamika Newman's Statement

Capanis has not identified any Supreme Court holding that the right to present a defense or right to due process includes a right to present evidence of a victim's character that the defense is unable to show actually pertains to the victim as opposed to another person. Capanis argues that Newman's statement should have been admitted because it would allow an inference that he (Capanis) acted in self-defense is unpersuasive because the defense did not represent to the trial court that Newman had seen the victim with the gun or even that the person who was observed with the gun in the past was present when the victim was shot. The California Court of Appeal reasonably concluded that Newman's proposed testimony that someone in the victim's group—but not necessarily the victim and not necessarily a person who was present on the night of the shooting— had a gun on a previous occasion was inadequate to show the victim's character to support an inference of the victim's conduct in conformity with that character that would in turn support self-defense. It would not have been an unreasonable application of Supreme Court precedent for the

United States District Court
Northern District of California

California Court of Appeal to conclude that Capanis' right to present a defense was not violated by the exclusion of Newman's statement.

Because "fairminded jurists could disagree" on whether the U.S. Supreme Court's cases on the right to due process and the right to present a defense extend to these routine applications of otherwise permissible rules of evidence, the California Court of Appeal's rejection of the claim would not support relief under § 2254(d).  *See Harrington v. Richter*, 562 U.S. at 101; *see also id.* at 103 (petitioner must show the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").

### b.   Lack of Instruction on Self-Defense

Federal habeas relief is available for the omission of a jury instruction only if the error "'so infected the entire trial that the resulting conviction violate[d] due process.'"  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  The Supreme Court has "long interpreted" the Due Process Clause "to require that criminal defendants be afforded a meaningful opportunity to present a complete defense."  *California v. Trombetta*, 467 U.S. 479, 485 (1984).  "When habeas is sought under 28 U.S.C. § 2254, "'[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable.'"  *Clark v. Brown*, 450 F.3d 898, 904–05 (9th Cir. 2006) (citation omitted); *see also Bradley v. Duncan*, 315 F.3d 1091, 1098 (9th Cir. 2002) ("[T]he right to present a defense would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense.") (internal quotation marks omitted); *Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995) (whether a constitutional violation has occurred in the failure to instruct on a defense theory will depend on the evidence in the case and the overall instructions given to the jury); *id.* at 743 (there must be some evidence to support the instruction in order for there to be a duty to instruct).  A state court's finding that the evidence at trial does not support the requested instruction is entitled to a presumption of correctness on federal habeas review.  *See Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).  If a constitutional error is found in the omission of an instruction, the federal

32

1    habeas court also must determine whether that error was harmless by looking at the actual impact

2    of the error. *Calderon v. Coleman*, 525 U.S. 141, 146–47 (1998). To warrant relief, the error must

3    have had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at

4    146 (quoting *Brecht*, 507 U.S. at 623).

5          The California Court of Appeal in this case determined that there was insufficient evidence

6    to support a duty to instruct. Capanis has not overcome the presumption of correctness that attends

7    that finding. As mentioned earlier Stephens' statement upon his arrest that he had ran because "they

8    were shooting at us" had been excluded as had Newman's statement that she saw someone in

9    Grijalva's group with a gun on an earlier occasion. There thus was no evidence that would have

10   permitted a rational jury to find self-defense. Given the dearth of evidence to support self-defense,

11   it was not an unreasonable application of Supreme Court precedent for the California Court of

12   Appeal to conclude that the failure to instruct on self-defense did not violate Capanis' right to due

13   process or to present a defense.

14         The trial court's statement during the defense closing argument—reminding the jury that the

15   court had not instructed on self-defense—definitely brought attention to the absence of the

16   possibility of a defense of self-defense. However, the statement was not an incorrect statement of

17   law and instead drew the jury's attention to the limits of the court's earlier instructions after defense

18   counsel veered toward a self-defense argument. Closing arguments in a criminal case need not be

19   left "uncontrolled," as the presiding judge has "great latitude in controlling the duration and limiting

20   the scope of closing summations. . . . [The judge] may ensure that argument does not stray unduly

21   from the mark, or otherwise impede the fair and orderly conduct of the trial." *Herring v. New York*,

22   422 U.S. 853, 862 (1975). In Capanis' case, the trial court's statement responded to defense

23   counsel's effort to suggest that the jury should consider self-defense. The trial court reasonably

24   could have determined that it was necessary to remind the jury that there was not a defense of self-

25   defense in this case so that the jury could focus on the evidence that had been presented and the

26   findings it did need to make to reach a verdict. The state appellate court reasonably could have

27   concluded that the trial court did nothing more than correct the misimpression defense counsel's

28   statements might have given the jury and therefore was allowable under *Herring*.

United States District Court
Northern District of California

A theme in Capanis' right-to-present-a-defense argument seems to be that, because he had no better evidence of self-defense, the trial court was required to allow him to present the little evidence he did have (regardless of its inadmissibility under standard evidence rules) and was required to give a self-defense instruction because he had no other viable defense. But he identifies no U.S. Supreme Court case so holding. Indeed, it would seem anomalous to have evidentiary rules at all if they are just abandoned when a defendant cannot satisfy them. Likewise, it would make little sense to impose a duty to instruct only when the evidence supports the instruction if the instruction must be given even when the evidence does not support the instruction. The California Court of Appeal's decision that was contrary to such a theme that procedural rules should be excused when a defendant cannot satisfy them did not run afoul of any clearly established federal law from the U.S. Supreme Court.

The state appellate court's rejection of the claim that Capanis' right to present a defense and right to due process were violated by the evidentiary rulings was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the U.S. Supreme Court. Capanis is not entitled to the writ on this claim.

### F. Limitation on Cross-Examination of Flores

Capanis next contends that his Sixth Amendment right to confront witnesses was violated when the trial court ruled that he could not impeach Jose Flores—the person who was kidnapped the day before the shooting and driven around before being dropped off—with evidence about an incident that led to Flores' arrest.

Before trial, the prosecution moved to exclude questioning of Jose Flores about events that occurred in February 2016, when a police officer who had been dispatched for a report of shots being fired found Flores in the driver's seat of a parked car with a female in the passenger seat. Dkt. No. 17-10 at 6 (RT 574). A backpack containing marijuana packaged for sale in baggies was found in the back seat of the car, and Flores admitted the marijuana was his. *Id.* at 6-7 (RT 574-75). Three other males were standing outside the car and a gun was found underneath a different car nearby. *Id.* at 7-9 (RT 575-77). Police officers wrote a "probable cause" statement to justify the arrest, but

1    that statement was not provided to the district attorney's office; no prosecution and no conviction

2    ever resulted.  *Id.* at 4-5, 8 (RT 572-73, 576).

3        At the in limine hearing, the trial court asked how Flores would be connected to the gun

4    when the gun was found only under a car near to his and where there were three other men standing

5    outside the car.  Defense counsel stated that eight bullets found in the backpack found in Flores'car

6    matched the caliber and manufacturer of the bullets in the loaded firearm that had been reported

7    stolen.  *Id.* at 7 (RT 575).

8        The trial court applied California Evidence Code §352 to exclude the evidence because its

9    probative value would be outweighed by its prejudicial effect.  The arrest had occurred 3-1/2 years

10   after the crime at issue in this case; the impeachment value was low because Flores'statement to

11   police shortly after the murder and kidnapping involving Capanis had not significantly changed after

12   his arrest.  The court also was concerned that Capanis'trial would have been disrupted with evidence

13   about the arrest of Flores because a lawyer would have to be appointed for Flores and questions of

14   immunity pursued if Flores was going to be asked about the arrest.  Dkt. No. 17-10 at 17 (RT 585).

15   The trial court concluded that questions about the underlying facts would not be allowed, but Flores

16   could be asked whether he had been arrested and whether he had a bias or motive to shade his

17   testimony in favor of the prosecution stemming from the unresolved charges.  *Id.* at 13, 18 (RT 581,

18   586).

19       The California Court of Appeal rejected Capanis' claims that the trial court's ruling was

20   erroneous under state law and violated Capanis' Confrontation Clause rights:

21       With respect to the possession of marijuana for sale, as the trial court noted, the
         conduct was unlike fraud or perjury, and the implication of dishonesty was an
22       indirect one.  (*See People v. Castro, supra*, 38 Cal.3d at p. 317 ["the trait involved
         [in possession of marijuana for sale] is not dishonesty but, rather, the intent to corrupt
23       others"].)  Although the conduct was near in time to Flores' testimony at trial, and
         thus perhaps relevant to his credibility with respect to that testimony, this relevance
24       was blunted by the fact that it had been over four years since the time of the shooting
         and Flores' original statement to the police in August of 2012.  And the conduct
25       involved problems of proof and undue consumption of time, because it was recent
         and uncharged and thus would have implicated Flores' privilege against self-
26       incrimination and necessitated his obtaining counsel.

27       With respect to carrying a concealed firearm, the evidence presented all the above
         problems, plus the additional difficulty that the evidence did not clearly demonstrate
28       that Flores engaged in the conduct at all: as noted, the gun was found under a nearby

                                                      35

car, and its only connection to Flores was tenuous, i.e., that the bullets inside the gun were of the same caliber and manufacturer as those found inside the backpack. (*See People v. Aguilar* (2016) 245 Cal.App.4th 1010, 1016−1020 [certain crimes involving firearms demonstrate moral turpitude to the extent they show "readiness to do evil"].)  The trial court did not abuse its discretion in concluding that the probative value of this conduct was outweighed by the problems with its admission.  For similar reasons, the trial court's ruling did not violate Capanis' rights under the confrontation clause. (*See People v. Brown* (2003) 31 Cal.4th 518, 545 ["reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination"].)

Dkt. No. 17-19 at 14 (Decision).

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).  Trial judges retain wide latitude to impose reasonable limits on cross-examinations based on concerns about, among other things, "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  A defendant "can prove a violation of his Sixth Amendment rights by 'showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009) (omission in original) (quoting *Van Arsdall*, 475 U.S. at 680).  A showing of constitutional error under the Confrontation Clause only merits habeas relief if the error was prejudicial, that is, if it had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 1100 (quoting *Brecht*, 507 U.S. at 637).

The California Court of Appeal's determination that there was no Confrontation Clause violation in the exclusion of this evidence was not an unreasonable application of U.S. Supreme Court precedent, which itself accords trial judges "wide latitude" to impose reasonable limits on cross-examination based on concerns about questioning "that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; *see, e.g., Plascencia v. Alameida*, 467 F.3d 1190, 1201 (9th Cir. 2006) (exclusion of cross-examination that would have provided cumulative or repetitive evidence did not violate Confrontation Clause or was harmless error).

It was not unreasonable for the California Court of Appeal to determine that excluding evidence about the circumstances of the arrest was a reasonable limitation on the cross-examination that did not violate Capanis' Confrontation Clause rights.  The circumstances of the arrest that had occurred more than three years after the crime at issue in this case had limited probative value and would have consumed undue time, given that the matter was still an open criminal case such that the witness' rights to counsel and against self-incrimination had to be addressed before he could be questioned about that matter.  The evidence regarding the gun was even more difficult with regard to proof because the evidence was not clear that Flores had possessed the gun that was found under another car.  As mentioned above, although the trial court refused to allow the facts underlying the arrest of Flores to be admitted, the trial court did allow the defense to ask Flores whether he had been arrested and whether the unresolved charges had an impact on Flores' trial testimony.  It was reasonable for the Court of Appeal to conclude that the federal constitution did not require the trial court to allow the jury to hear evidence about the facts underlying the arrest of Flores 3-1/2 years after he first spoke to police about the shooting in this case.

G.  Refusal to Instruct on Good-Character Evidence

Capanis urges that his right to due process was violated because the trial court refused to give a jury instruction on character evidence that stated, in effect, that evidence of the defendant's good character can by itself create a reasonable doubt as to his guilt.  He contends that the testimony of witness David Riley provided an evidentiary basis for giving the instruction.  He further argues that, because the trial court had excluded evidence that supported a self-defense theory—i.e., Stephens' statement upon his arrest that "they were shooting at us" and Newman's statement that she once saw someone in the victim's group with a gun—"[t]he only defense theory left was that Capanis' character and lifestyle was sufficiently contrary to that portrayed by the prosecutor to sustain a reasonable doubt."  Dkt. No. 11-1 at 40.  According to Capanis, Riley's testimony tended to rebut the prosecution's theory that Capanis was "blessed" by the Northern Structure, set up a Norteño "regiment," generally conducted himself as a "ranking" Norteño, and shot Grijalva without provocation.  *Id.* at 41.

1. Background

At trial, David Riley testified that he was nervous about testifying because he had been in custody before and knew that "this kind of stuff can get somebody killed." Dkt. No. 17-12 at 10 (RT 922). Riley gave conflicting testimony on his concerns. He stated that Capanis would not want him killed, but "it would be outside of his hands. That's why I'm nervous." *Id.* at 11 (RT 923). Riley denied telling the prosecutor's investigator that he did not want to testify because he would be killed by the Northern Structure, did not remember if he told law enforcement that Capanis was part of the Northern Structure, did remember stating that the Northern Structure would kill him if he testified, and did not recall telling law enforcement that Capanis had a lot of power and that was why he (Riley) would be killed if he testified. *Id.* at 15-21 (RT 927-33). Riley obsequiously identified Capanis in the courtroom: "He's got a good looking hair cut. He looks good. Got a beautiful shirt on, nice vest. I wish I had class like that." *Id.* at 11 (RT 923). Riley admitted that he had pled guilty to a crime committed with Capanis that involved breaking into somebody's garage with a shotgun and stealing items. *Id.* at 12 (RT 924).[6] Riley said he had known Capanis since they were children, that Capanis "is a good person" but had been "around bad people and when you are around bad people, bad things happen and here he is now again." *Id.* at 13 (RT 925). He stated that he and Capanis were Northerners in prison but not Norteño. *Id.* at 15-24 (RT 927-36). He testified that the Northerners wanted prisoners to get out of prison, find jobs, have a family, and "it's a lot of love and unity." *Id.* at 26-27 (RT 938-39).

The next witness was the prosecutor's investigator who had contacted Riley a few days before trial to talk about Capanis. The investigator testified that Riley was "almost crying" and "very upset" about the prospect of testifying because he thought he would be killed by the Northern Structure. *Id.* at 45-48 (RT 957-60). According to the investigator, Riley ultimately indicated that it was Capanis' power in the Northern Structure that made Riley afraid to testify. *Id.* at 49 (RT 961).

---

[6] Evidence was admitted through other witnesses that David Riley and Capanis had pleaded guilty to a robbery in Sacramento in March 2007, during which the door from a house to a garage was kicked in and two men wearing hoodies and scarves over their faces appeared with shotguns, forced the two occupants to the ground, and stole a wallet and cell phone. Dkt. No. 17-11 at 95-102 (RT 831-840).

United States District Court
Northern District of California

United States District Court
Northern District of California

During the jury instruction conference at the end of trial, defense counsel asked that the jury be instructed with CALCRIM 350.  That instruction would have told the jury that it had heard evidence of defendant's good character, and evidence of good character "can by itself create a reasonable doubt" whether the defendant committed the crime, "[h]owever, evidence of the defendant's good character may be countered by evidence of his bad character for the same trait." CALCRIM 350.  The trial court refused to give the instruction, explaining that it was not appropriate in light of the court's rulings that prohibited the prosecutor from asking about Riley's knowledge of Capanis' ongoing criminal activities after his release from prison and his violations while on supervised release,  or even questions as to whether the witness had heard negative facts reflecting on Capanis' character.  Dkt. No. 17-16 at 18-20 (RT 1550-52).  Due to the limitations the court had imposed on cross-examination, "the jury would get a distorted view of this character evidence testimony" with the requested instruction.  *Id.* at 20 (RT 1552).  The court did not, however, preclude the defense from urging during closing argument that Capanis was a law-abiding citizen.  *Id.* at 20-21 (RT 1552-53).

The California Court of Appeal rejected Capanis' federal constitutional and state law challenges to the refusal to give the instruction, discussing only the state law claim.  Dkt. No. 17-19 at 16 (Decision).  The state appellate court determined that, even if there was any error in refusing to give the instruction, the error was harmless under state law because "extensive evidence" of Capanis' guilt had been presented and the jury had received a general instruction that, "'[i]n deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.'"  *Id.*; *see* CT 569 (CALCRIM 220).

2.  Analysis

As mentioned earlier, federal habeas relief is available for the omission of a jury instruction only if the error "'so infected the entire trial that the resulting conviction violate[d] due process.'" *Henderson*, 431 U.S. at 154.   The omission of an instruction is less likely to be prejudicial than a misstatement of the law, so the petitioner bears an "especially heavy" burden.  *See Walker v. Endell*,

39

1    850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson*, 431 U.S. at 155).  If a constitutional error

2    is found in the omission of an instruction, the federal habeas court also must determine whether that

3    error was harmless by looking at the actual impact of the error.  *Calderon v. Coleman*, 525 U.S. at

4    146-47.  The habeas court must apply the harmless-error test set forth in *Brecht* to determine whether

5    the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"

6    *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (quoting *Brecht*, 507 U.S. at 623).

7            The California Court of Appeal's unexplained denial of the federal due process claim was

8    not contrary to, or an unreasonable application of Supreme Court precedent.  Capanis identifies no

9    Supreme Court precedent that has determined, or even considered, whether a court's failure to

10   provide an instruction on good character to which a defendant might be entitled under state law

11   under circumstances similar to those presented here violates the Due Process Clause.  Although the

12   Supreme Court "has held that such testimony alone, in some circumstances, may be enough to raise

13   a reasonable doubt of guilt and that in the federal courts a jury in a proper case should be so

14   instructed," *Michelson v. United States*, 335 U.S. 469, 476 (1948) (citing *Edgington v. United States*,

15   164 U.S. 361 (1896)), the Supreme Court has not held that the Due Process Clause requires such an

16   instruction.  *Michelson* discussed whether to limit cross-examination on character evidence and

17   declined to impose any blanket rule, *id.* at 224; *Michelson* contains no holding on any duty to instruct

18   regarding character evidence, let alone any holding that there is a constitutional duty to give a good-

19   character instruction.  Due to the lack of clearly established Supreme Court precedent on this subject,

20   it cannot be said that the state appellate court's rejection of the due process claim was contrary to or

21   an unreasonable application of clearly established federal law, which is a necessary showing for

22   habeas relief.  *See Carey v. Musladin*, 549 U.S. 70, 77 (2006). ("Given the lack of holdings from

23   this Court . . . , it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established

24   Federal law").

25           The general principle that habeas relief may be  had for an instructional error that so infects

26   the entire trial that the resulting conviction violates due process, *see Henderson*, 431 U.S. at 154,

27   does not help Capanis because the California Court of Appeal reasonably could have determined

28   that the absence of an instruction that good character evidence may show reasonable doubt as to

United States District Court
Northern District of California

guilt did not make Capanis' trial fundamentally unfair.  Capanis already had the benefit of the exclusion of evidence that would have put that good-character testimony in perspective and due process did not require that he receive the additional benefit of the instruction that emphasized that testimony.  The prosecution had been precluded from testing Riley's assertion that Capanis had a good character with evidence about Capanis' criminal conduct and in-custody misbehavior.  Had the prosecution been allowed to ask Riley about Capanis' criminal activity, reported leadership in the Norteño gang, and in-custody misbehavior, no reasonable juror would have put any stock in Riley's view that Capanis had a good character.  The evidence of good character was admitted (as the court did not strike any of Riley's testimony that Capanis was a good person) and the defense was not categorically precluded from arguing that Riley's testimony showed Capanis' good character.  And the jury was instructed on reasonable doubt and told that it had to "impartially compare and consider all the evidence" in determining whether the prosecution had proven its case beyond a reasonable doubt.  CALCRIM 220.  These circumstances combined would have provided sufficient support for the California Court of Appeal to reasonably conclude the refusal to give the instruction did not violate Capanis' right to due process.

Even if one assumes that the failure to give the instruction resulted in a due process violation, any such error was harmless.  Riley's brief statement that Capanis was a good person with a good heart had no real probative force because of the evidence that Riley was very scared of being harmed by the Northern Structure prison gang, an entity that other evidence connected to Capanis.  Even without the fear factor, Riley's testimony had very limited probative effect because he equivocated as to whether he actually knew what Capanis had been doing in the several months after they were released from prison.  RT 939-40.  Having heard the details about the Norteño criminal street gang and its relationship to the Northern Structure prison gang from other witnesses, it was extremely unlikely that any juror would have believed Riley's praise of Capanis' character.  The California Court of Appeal reasonably could have concluded that any assumed constitutional error was harmless.

Respondent argues that the challenge to the refusal to give the instruction was forfeited because Capanis benefited from the exclusion of the evidence about Capanis that would have

impeached Riley's opinion that Capanis had a good character.  Although a doctrine such as judicial estoppel could have led a state court to preclude Capanis from asserting that he had a right to a favorable jury instruction after having benefited from the exclusion of evidence that would have rendered such an instruction nugatory, the California Court of Appeal did not apply a judicial estoppel analysis (or, in respondent's words, a forfeiture analysis).  This court will not assume that the state appellate court imposed a procedural bar, such as judicial estoppel, that was presented to but not decided by the state appellate court.  Lastly, respondent has not identified any authority for a federal habeas court to reject a claim on a forfeiture theory.

Capanis is not entitled to the writ on the claim that the refusal to give the good-character instruction violated his federal constitutional rights.

H.  No Certificate of Appealability

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is DENIED.

## CONCLUSION

For the foregoing reasons, the amended petition for writ of habeas corpus is DENIED on the merits.   The clerk shall close the file.

**IT IS SO ORDERED**.

Dated:  October 26, 2020

_____
SUSAN ILLSTON
United States District Judge